IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CURTIS J. WILLIAMS,

      Plaintiff,                       No. CIV S-05-0164 DFL EFB P

      vs.

R. W. SANDHAM, et al.,

      Defendants.                FINDINGS AND RECOMMENDATIONS

_____/

      Plaintiff is a prisoner without counsel suing for alleged civil rights violations. *See* 42 U.S.C. § 1983. This action proceeds on the January 26, 2005, complaint in which plaintiff claims that defendants Drs. Sandham, Steen, Rohlfing and Mangis were deliberately indifferent to his serious medical needs. Plaintiff asserts that he suffers from a serious eye condition that required a certain medication and surgery, both of which, he claims, the defendants refused to provide. All defendants move for summary judgment. Plaintiff opposes and cross-moves for summary judgment. For the reasons explained below, the court finds that there is no genuine issue about whether defendants were deliberately indifferent to plaintiff's medical needs. Therefore, they are entitled to judgment as a matter of law.

////

////

**I.      Facts**

At the time of the events giving rise to this action, plaintiff was a prisoner in the California Department of Corrections and Rehabilitation. On January 29, 2003, he was transferred from California State Prison at Lancaster, to High Desert State Prison ("HDSP"). Deposition of Plaintiff ("Pl. Dep.") at 17. He remained at HDSP until August 30, 2005, when he was transferred to Corcoran State Prison ("Corcoran"). *Id.* Dr. Sandham was the Chief Medical Officer ("CMO") at HDSP from January 2003 until January 2005. Declaration of Sandham ("Sandham Dec."), at ¶ 2. Dr. Rohlfing is a physician who worked at HDSP from August 2000 until July 2005. Declaration of Rohlfing ("Rohlfing Dec."), at ¶ 2. Dr. Steen is an ophthalmologist with whom HDSP contracted for services while plaintiff was at HDSP. Sandham Dec., at ¶ 3; Declaration of Steen ("Steen Dec."), at ¶¶ 3, 4. Dr. Mangis is a physician who worked at HDSP from September 2003 until September 2004. Declaration of Mangis ("Mangis Dec."), at ¶ 2.

Plaintiff has Schnyder's crystalline dystrophy, a condition in which crystalline deposits form on the cornea. Ex. D to Defs.' Mot. at 1-2.[1] Plaintiff has a donut-like ring of crystalline deposits near the center of each cornea but the central zone is clear. *Id*. His medical history shows that his visual acuity was 20/200 in each eye, but now may be as bad as 20/2400. Ex. C to Steen Mot.; Pl. Dep. at 24. He uses two different pairs of eyeglasses. One pair is for magnification when reading and the other is for distance. Pl. Dep. at 23. The pair used for distance vision is tinted because plaintiff is very sensitive to light. *Id.* The tinted distance eyeglasses minimize plaintiff's dizzy spells. *Id*. at 23-24. Plaintiff admits that these glasses help him during the time he showers, uses the yard, and navigates the prison as required by the daily routine. *Id*. at 24. But there also are times when he must lay down to avoid becoming so dizzy

---

[1] Defendants Mangis, Sandham and Rohlfing are represented by counsel from the California Attorney General's office, while defendant Steen has separate counsel who submitted separate briefing and exhibits. The court refers herein to the former three defendants' exhibits as "Ex. __ to Defs.' Mot." The court refers to defendant Steen's exhibits as, "Ex. __ to Steen Mot."

that he falls. *Id*. at 24-25. It is not clear from the record who prescribed these glasses or when they were prescribed. However, before his transfer to HDSP, a doctor at California State Prison - Los Angeles County, recommended that plaintiff see a corneal expert to evaluate the need for surgery and prescribed Murocel 1% for plaintiff. Compl., at 3; Pl. Dep. at 19-21. When he arrived at HDSP, Dr. Rohlfing immediately prescribed artificial tears, without specifying the brand or solution percentage, and ocular lubricant for plaintiff. Ex. C to Defs.' Mot., at 1. On March 12, 2003, Dr. Rohlfing ordered Murocel 1% and artificial tear ointment for plaintiff. *Id.* at 2-3. He also recommended an ophthalmology consultation, and ordered plaintiff to return in 30 days. *Id*. Murocel 1% is a form of artificial tears which is not on the list of medications available to prisoners at HDSP. Ex. H to Defs.' Mot., at 3. Other artificial tears are available to HDSP prisoners. *Id*.

As a result of defendant Rohlfing's March 12 recommendation, plaintiff saw defendant Dr. Steen on April 14, 2003. Ex. C to Steen Mot.; Ex. C. to Defs.' Mot., at 3. On examination, Dr. Steen determined that plaintiff had crystalline deposits on both corneas. Ex. C to Steen Mot. Dr. Steen diagnosed plaintiff with bilateral corneal dystrophy and recommended that plaintiff see a corneal specialist for consideration of a corneal transplant. *Id*.; Ex. C to Defs.' Mot., at 3. On April 22, 2003, Dr. Rohlfing requested Murocel 1% be ordered for plaintiff and requested that plaintiff be approved for consultation with a corneal specialist. Ex. C to Defs.' Mot., at 4-5.

On May 22, 2003, plaintiff returned Dr. Rohlfing again. Dr. Rohlfing noted Dr. Steen's recommendation that plaintiff see a corneal specialist and documented his concurrence in this recommendation. *Id.* On June 5, 2003, Dr. Rohlfing prescribed artificial tears, without specifying the brand or solution percentage. *Id*., at 7.

As a result of Dr. Rohlfing's recommendation, plaintiff saw Dr. Gregory C. Tesluk on July 14, 2003. Ex. D to Defs.' Mot. Dr. Tesluk examined plaintiff, but it was difficult because plaintiff squints. *Id*.; Ex. D to Steen Mot., at 5. Dr. Tesluk determined that the macula appeared normal and that the optic nerve and intra-ocular pressures were normal. Ex. D to Defs.' Mot.;

Ex. D to Steen Mot., at 5. However, plaintiff had "dense linear opacities of the central superficial cornea in each eye." *Id*. Dr. Tesluk diagnosed plaintiff with lattice corneal degeneration, which is a hereditary form of corneal dystrophy. *Id*. He noted that although corneal transplant can improve visual acuity for patients with this condition, he determined that plaintiff was not a good candidate for such surgery. Patients like plaintiff who squint excessively have a "higher-than-usual chance of failure." *Id*. Plaintiff's squinting also could make the many necessary follow-up examinations difficult. *Id.* A lack of medical history made it impossible to determine whether surgery would improve plaintiff's visual acuity. Ex. D to Steen Mot.; Ex. D to Defs.' Mot., at 5-6. Therefore, Dr. Tesluk did not recommend surgery, but he did recommend that plaintiff continue to use artificial tears and ointment. *Id*.

On August 5, 2003, Dr. Rohlfing renewed plaintiff's eye drop prescription. Ex. C to Defs.' Mot., at 9. On August 27, 2003, Dr. Rholfing prescribed plaintiff Methylcellulose .5% in place of Muracel 1%. *Id*., at 10. In his answers to interrogatories, Dr. Rohlfing asserts that he lacks the expertise to know whether the artificial tears he prescribed were the therapeutic equivalent of Muracel 1%, and also that he had no medical evidence that the artificial tears prescribed were any different from Muracel 1%. Ex. H to Defs.' Mot., at 3-4. He also asserts that he ordered Muracel 1% for plaintiff in an attempt to accommodate plaintiff. *Id*., at 4.

On September 8, 2003, plaintiff complained that a .5% solution of artificial tears was not strong enough. Ex. C to Defs.' Mot., at 11. Dr. Rohlfing noted that Murocel 1% was not available and that he had discussed the matter with the pharmacist, who said that the wholesaler had no more than a .5% solution. *Id*. He also noted that there was not much he could do for plaintiff and questioned whether plaintiff should be transferred to a different institution because of his medical problems. *Id*.

On September 22, 2003, Dr. Rohlfing explained to plaintiff that Dr. Tesluk did not believe that plaintiff would benefit from a corneal transplant. *Id*., at 13. Plaintiff complained that his vision and his spells of dizziness were getting worse, and that he felt on occasion that

1  "he may fall out." Dr. Rholfing also noted that although the .5% artificial tear solution was not
2  as good, the pharmacy could not obtain it. In any case, Dr. Rholfing did not see any indication
3  that the 1% solution was necessary, and he renewed the prescription for Murocel .5%. *Id.* Dr.
4  Rohlfing also recommended that plaintiff see Dr. Steen again. *Id.* On September 26, 2003,
5  plaintiff saw Dr. Rohlfing for complaints of dizziness and faintness. *Id.*, at 15. Dr. Rohlfing
6  noted that plaintiff had a problem with squinting, and he again prescribed a .5% artificial tear
7  solution and an ointment. *Id.* He also prescribed Zantac.[2] *Id.* Following an October 28, 2003,
8  appointment with plaintiff, Dr. Rohlfing observed that plaintiff's condition amounted to a
9  "wearing out," of plaintiff's corneas as a result of a genetic disorder that was outside his area of
10 expertise. *Id.*, at 17. He discontinued one prescription for artificial tears and continued with just
11 Murocel .5%. *Id.* Dr. Rohlfing had no authority to transfer plaintiff to a different institution.
12 Rohlfing Dec., at ¶¶ 3, 4, 5.

Plaintiff saw Dr. Steen again on December 8, 2003. As a result of that visit, Dr. Steen recommended a consultation with a corneal specialist to see whether surgery could help decrease plaintiff's photophobia and increase his visual acuity. Ex. E to Steen Mot.; Ex. C to Defs.' Mot., at 19. He renewed a prescription for artificial tears and recommended that plaintiff return for a follow-up visit in six months. Ex. E to Steen Mot.; Ex. C to Defs.' Mot., at 19.

On March 29, 2004, plaintiff saw Dr. Ivan Schwab, a professor of corneal and external disease in the Department of Ophthalmology at the University of California, Davis Medical Center. Ex. E to Defs.' Mot., at 1-2; Ex. F to Steen Mot. The purpose of the visit was to determine the severity of plaintiff's condition. Dr. Schwab verified the diagnosis of Schnyder's crystalline dystrophy and considered the possibility of Glaucoma. Ex. E to Defs.' Mot., at 1-2; Ex. F to Steen Mot., at 5-6. Dr. Schwab recommended that plaintiff undergo a lipid profile and
////

---

[2] Zantac is prescribed for treatment of ulcers and other digestive disorders. *Physicians' Desk Reference*, 1624 (61st ed. 2001).

testing to check his cholesterol levels "because of the dense arcus[3] and the history with this disease process." Ex. E to Defs.' Mot., at 1; Ex. F to Steen Mot., at F. Dr. Schwab was of the opinion plaintiff's corneal condition did not cause plaintiff to suffer reduced visual acuity. Ex. E to Defs.' Mot., at 2; Ex. F to Steen Mot., at 6. He questioned whether plaintiff's vision was as bad as plaintiff claimed and recommended a pattern electroretinogram ("ERG") to evaluate plaintiff's visual acuity. Ex. E to Defs.' Mot., at 2; Ex. F to Steen Mot.,. at 5-6. Dr. Schwab recommended against a corneal transplant. Ex. E to Defs.' Mot., at 2; Ex. F to Steen Mot., at 6. He followed up on this recommendation by writing a letter to Dr. Sandham, explaining that corneal dystrophy ordinarily does not interfere with vision, and stating that the lipid tests should be done. Ex. F to Defs.' Mot., at 3; Ex. F to Steen Mot., at 8.

On June 1, 2004, plaintiff saw Dr. Mangis for complaints of headaches and dizziness, and for renewal of prescriptions. Dr. Mangis renewed plaintiff's eye drop prescription and ordered a fasting lipid panel. Ex. F to Defs.' Mot., at 1. Plaintiff saw Dr. Steen again on June 7, 2004. Dr. Steen could not check the pressure in plaintiff's eyes because of plaintiff's squinting. Ex. G to Steen Mot. Dr. Steen again considered the possibility that plaintiff might have Glaucoma. *Id.* After examining plaintiff, Dr. Steen determined that plaintiff had symptoms of conversion reaction[4] and again verified the diagnosis of Schnyder's corneal dystrophy. *Id.* Like Dr. Schwab, he also recommended an ERG. *Id.* Finally, Dr. Steen prescribed Timoptic .5% eye drops. *Id.* On both June 9 and June 28, 2004, plaintiff refused the blood draw necessary for the lipid and cholesterol testing, but ultimately consented. Ex. G to Defs.' Mot., at unnumbered

---

[3] The corneal arcus is, "a white or grey opaque ring in the corneal margin, present at birth, or appearing later in life, and becoming quite frequent in those over 50; it results from cholesterol deposits in or hyalinosis of the corneal stroma and may be associated with ocular defects or with familial hyperlipidemia." *Dorland's Illustrated Medical Dictionary*, 122 (27th ed. 1988).

[4] "Conversion reaction," also known as "conversion disorder," is a condition in which one experiences a change in or loss of a physical function as the result or expression of an underlying psychological conflict or need. *See* www.emedicine.com/EMERG/topic112.htm; *DSM-IV-TR,* 492 (4th ed. 2000).

6

pages 2, 3. All plaintiff's levels were within the normal range, except the LDL cholesterol. Ex. G to Defs.' Mot., at unnumbered page 4.

Plaintiff returned to Dr. Mangis on June 15, 2004, to discuss a grievance plaintiff had filed. Dr. Mangis noted that prison medical staff were arranging vision tests and lipid tests, and that Dr. Steen recently had prescribed ophthalmological medication. Ex. F to Defs.' Mot., at 2. He also noted that plaintiff would continue under the care of Dr. Steen. *Id.*, at 2; Mangis Dec., at ¶¶ 3, 5.

Plaintiff underwent the ERG on July 9, 2004. Ex. E to Defs.' Mot., at 5-6. Dr. Keltner, a professor of ophthalmology, neurology and neurological surgery at U.C. Davis Medical Center, reviewed the results. He concluded that nearly every part of the test showed plaintiff to be within normal limits and that the abnormalities present suggested a cone[5] abnormality or dystrophy. Ex. E to Defs.' Mot., at 1; Ex. H to Steen Mot., at 12. Dr. Schwab also reviewed the results of plaintiff's ERG, and reported to Dr. Sandham that although the results were "somewhat abnormal," they were not so abnormal as to suggest loss of vision. Ex. E to Defs.' Mot., at 7; Ex. F to Steen Mot., at 8. Dr. Schwab informed Dr. Sandham that plaintiff's medication successfully was controlling the pressure in plaintiff's eyes and that there was no treatment or medication that could change plaintiff's visual acuity. Ex. E to Defs.' Mot., at 7-8; Ex. F to Steen Mot., at 8.

As a result of plaintiff filing a grievance (the grievance was not submitted with the motion), Dr. Mangis interviewed plaintiff on August 25, 2004. Plaintiff complained that he could not read, needed a mirror to administer his eyedrops, could not use his eyedrops because they made him dizzy, needed renewed permission for a lower bunk, needed a "hearing impaired machine" in the law library, wanted Muracel 1% or stronger and wanted access to braille classes.

---

[5] The retina has three layers, one of which is called the *"pars optica,"* which in turn has nine layers. One layer of the *"pars optica,"* is comprised of rods and cones, which "form[] the percipient element of the retina (i.e., the element that responds to visual stimuli by a photochemical reaction)." *Dorland's Medical Dictionary*, 1455 (27th ed. 1088).

7

Ex. F to Defs.' Mot., at 3. Dr. Mangis reviewed plaintiff's medical history, including the testing, recommendations, findings and conclusions of the physicians both at the prison and at U.C. Davis. *Id.* Dr. Mangis also noted that plaintiff, in the presence of himself, four guards and a medical technical assistant, was able to identify his handwriting and signature on the grievance form from a distance of about six feet. *Id.* Plaintiff's handwriting was neat and deviated neither above nor below the lines. *Id.* at 4. Furthermore, the guards who escorted plaintiff to the interview explained that, while they told plaintiff where to turn corners, plaintiff negotiated them with the facility of a sighted person. *Id.* at 3. Dr. Mangis denied the appeal. *Id.* at 4.

On September 13, 2004, plaintiff returned to Dr. Steen. The examination was difficult because of plaintiff's squinting. Ex. I to Steen Mot. At this time, Dr. Steen diagnosed plaintiff with secondary glaucoma and corneal dystrophy and prescribed Xalatan.[6] *Id.* When plaintiff saw defendant Steen on December 6, 2004, plaintiff had not used eye drops for nearly two months. Ex. J to Steen Mot. Again, Dr. Steen suspected glaucoma and recommended Xalatan drops. *Id.* He also recommended that plaintiff undergo another ERG after plaintiff's intra-ocular pressure was normalized. *Id.* When plaintiff returned to Dr. Steen on March 14, 2005, it was nearly impossible for Dr. Steen to measure plaintiff's intra-ocular eye pressure because of plaintiff's squinting. Ex. K to Steen Mot. Again, Dr. Steen diagnosed plaintiff with glaucoma and corneal dystrophy, and he prescribed Xalatan, Alphagan and .5% Timpoptic drops. *Id.* Plaintiff saw Dr. Steen for the last time on June 13, 2005. Dr. Steen noted crystalline on both corneas in an amount that was unchanged since plaintiff's first visit with him. Ex. L to Steen Mot. He could not check plaintiff's intra-optic pressure because of plaintiff's squinting. *Id.*

Dr. Sandham never examined plaintiff or saw him in a clinical setting, but he approved plaintiff's consultations with Drs. Tesluk, Steen and Schwab. Sandham Dec., at ¶¶ 4, 6.

---

[6] Xalatan is an ophthalmic solution prescribed for "the reduction of elevated intraocular pressure in patients with open-angle glaucoma or ocular hypertension." *Physician's Desk Reference*, 2649 (61st ed. 2007).

8

**II.     Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[7]  The standards under Rule 56 to determine whether there is a "genuine issue of material fact" are well established:

> [T]he Supreme Court, by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment. First, the Court has made clear that if the nonmoving party will bear the burden of proof at trial as to an element essential to its case, and that party fails to make a showing sufficient to establish a genuine dispute of fact with respect to the existence of that element, then summary judgment is appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Second, to withstand a motion for summary judgment, the non-moving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis added).  Finally, if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be argued that *any disagreement* about a material issue of fact precludes the use of summary judgment.

*California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert. denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).  There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the

---

[7] On October 5, 2004, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

nonmoving party's case because all other facts are thereby rendered immaterial. *Celotex,* 477 U.S. at 323.

With these standards in mind, it is important to note that plaintiff bears the burden of proof at trial over the issue raised on this motion, i.e., whether the defendant acted with deliberate indifference to the plaintiff's safety. Equally important is that "deliberate indifference" is an essential element of plaintiff's cause of action. Therefore, to withstand defendant's motion, plaintiff may not rest on the mere allegations or denials of his pleadings. He must demonstrate a genuine issue for trial. *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989). He must rely on evidence based upon which a fair-minded jury "could return a verdict for [him] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Here, plaintiff's action arises under 42 U.S.C. Section 1983 and the Eighth Amendment. To prevail at trial, he must prove that the defendant deprived him of his Eighth Amendment rights while acting under color of state law. Plaintiff has the initial burden of showing by a preponderance of competent evidence that the defendants knew of plaintiff's serious medical needs but failed to take reasonable measures to treat it. *See Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But defendants have the burden of proving that they were unaware of the risk, or if they knew of it, that they responded reasonably even if the harm nevertheless occurred. *Farmer*, 511 U.S. at 844. As discussed below, the evidence before the court is insufficient to find that there is a genuine dispute about whether defendants were deliberately indifferent to plaintiff's serious medical needs.

////

////

**III.    Analysis**

Plaintiff's claim of a violation of his Eighth Amendment rights is predicated on his allegation that defendants were deliberately indifferent to his eye condition. He faults defendants for not providing him with Murocel 1% eye drops and for not permitting him to undergo a corneal transplant. All defendants assert that they took reasonable measures to treat plaintiff's condition.

Prison officials violate the Eighth Amendment when they engage in "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A prison official is deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate." *See Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The official must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Deliberate indifference "may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). When prison medical personnel act based on "a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996). Prison officials provide constitutionally inadequate care when they know that a particular course of treatment is ineffective, but they do not alter it in an attempt to improve treatment. *See Jett v. Penner*, 439 F.3d 1091, 1097-1098 (9th Cir. 2006).

It is undisputed that plaintiff suffers from Schnyder's dystrophy. Crystalline deposits have formed a ring around the perimeter of the cornea on each eye. Defendant Dr. Rohlfing

11

concedes he did not understand plaintiff's disease or the difference between a .5% and 1% artificial tear solution. Despite his lack of knowledge regarding artificial tears, he attempted to obtain Murocel 1% simply because plaintiff was accustomed to using it. It was not until after plaintiff saw Dr. Tesluk, who did not specify that plaintiff required a 1% solution, that Dr. Rohlfing noted that he did not see a need for the 1% solution. But Dr. Rohlfing recommended, and Dr. Sandham approved, plaintiff's regular visits to experts outside the prison, including defendant Dr. Steen, Dr. Tesluk, Dr. Schwab and Dr. Keltner. He also followed the recommendations of these doctors with respect to treatment, additional referrals and follow-up appointments.

Defendant Steen saw plaintiff at least seven times between April 14, 2003, and June 15, 2005. Defendant Steen has submitted evidence that he examined plaintiff each time and consistently diagnosed plaintiff with crystalline dystrophy and possibly glaucoma. He prescribed a .5% artificial tear solution and ultimately discovered abnormal intra-ocular pressures, for which he prescribed treatment. He also recommended an ERG. Apparently recognizing that plaintiff would benefit from examination by a more specialized doctor, he recommended that plaintiff see a corneal specialist to evaluate plaintiff as a candidate for surgery both to increase his vision and to decrease his photophobia.

Dr. Rohlfing and Dr. Sandham followed Dr. Steen's recommendation and referred plaintiff first to Dr. Tesluk. Like Dr. Steen in his first examination of plaintiff, Dr. Tesluk found that plaintiff's intra-ocular pressures were normal and diagnosed plaintiff with heredity corneal dystrophy. However, Dr. Tesluk concluded that plaintiff was not a good candidate for a corneal transplant because plaintiff's squinting made the surgery intolerably risky and would make the necessary follow-up examinations very difficult, and the lack of a reliable family history made it impossible to assess possible benefit of such surgery. He recommended that plaintiff continue to use artificial tears and ointment.

////

Defendant Dr. Rohlfing next recommended, and Dr Sandham approved, that plaintiff be referred to ophthalmological experts at U.C. Davis Medical Center. One of these, Dr. Schwab diagnosed plaintiff with Schnyder's dystrophy and considered the possibility that plaintiff might have glaucoma. Understanding the underlying causes of Schnyder's dystrophy, he recommended lipid and cholesterol testing. Dr. Rholfing ensured this testing occurred. Also, since Dr. Schwab understood that plaintiff's condition does not ordinarily interfere with visual acuity, he recommended an ERG. Plaintiff underwent this procedure. A neuro-ophthalmologist at U.C. Davis reviewed the results and found that they were, in fact, within normal limits. Ultimately, Dr. Schwab determined that there was no treatment, including surgery, that would improve plaintiff's visual acuity.

Defendant Dr. Mangis first saw plaintiff for complaints of dizziness and headaches, and to renew plaintiff's prescriptions. He renewed the prescriptions and ordered a lipid panel. He also interviewed plaintiff when plaintiff filed an appeal concerning the treatment he was receiving for his eyes. He reviewed plaintiff's medical records, which demonstrated that he had seen Dr. Rohlfing and a number of experts outside the prison and that they were ordering and performing diagnostic tests. He also observed that plaintiff's writing was neat, plaintiff could identify his writing and signature from a distance of about six feet, and guards reported that plaintiff navigated the prison's hallways like a sighted person. He therefore denied plaintiff's requests for special services based on a visual impairment.

Overall, the evidence shows that plaintiff suffers from a disease that has limited treatment options. Defendant Rohlfing repeatedly examined him, referred him to specialists and followed the recommendations of those specialists. Dr. Sandham approved the referrals to outside specialists. Dr. Steen repeatedly examined plaintiff, monitored his condition, recommended he see a corneal specialist, recommended clinical testing, accurately diagnosed plaintiff and prescribed what medications he determined were necessary. In evaluating plaintiff's grievances, Dr. Mangis reviewed plaintiff's medical records, recorded his personal observations and noted

the observations of other prison staff.

With respect to plaintiff's complaint that defendants were deliberately indifferent by failing to prescribe Murocel 1%, the court finds that there is no genuine issue for trial. Plaintiff alleges that the .5% artificial tear solution is "inadequate," because unlike the Murocel 1%, it did not eliminate his dizziness, blurred vision or fainting. He associates dizziness and fainting spells with the shift from the 1% solution to .5% because these symptoms worsened around the time he was transferred to HDSP, where Murocel 1% was not available. Pl. Dep., at 33-34. As far as the court can discern, artificial tears ease discomfort associated with dry eyes. No party explains what the percentage of solution refers to, but it is reasonable to infer that it has to do with its potency. It could be actual lubricant that would coat something like a layer of crystalline deposits. Or, it could be an anti-inflammatory that would reduce irritation caused by something like a layer of crystalline deposits. Or, it could be that the percentage affects the amount of time the medication is effective and, therefore, the frequency with which it should be used. There is no evidence that, whatever effect Murocel 1% has on the eyes, the result is the prevention of dizziness, blurred vision or fainting. Since plaintiff has the initial burden at trial, he must submit evidence of how the .5% solution was inadequate and how the 1% solution would have remedied the problem. He has not done this. Therefore, even without any explanation on this point from the defendants, no reasonable jury could find that defendants knew of the inadequacy and how to correct it, yet failed to take reasonable measures to do so. There is, therefore, no genuine issue of material fact for trial and defendants are entitled to summary judgment on this claim.

With respect to plaintiff's complaint that he needs a corneal transplant, the court again finds that there is no genuine issue for trial. Plaintiff has produced no evidence that any doctor ever found that he required and was a good candidate for this surgery. Defendants, however, have submitted evidence that, at the very least, plaintiff's tendency to squint and his lack of a reliable medical history made him a poor candidate for surgery. Furthermore, an expert at U.C. Davis found that such a transplant likely would not improve plaintiff's visual acuity. In fact, this

expert concluded that no treatment could improve plaintiff's visual acuity. Thus, on the evidence before the court, plaintiff cannot prove the essential element of his claim that defendants knew he needed a corneal transplant. Nor can he prove that they failed to take reasonable measures to provide him with this surgery. Dr. Rohlfing referred plaintiff to ophthalmologists. Dr. Sandham approved the referrals, and as a result, plaintiff saw Dr. Tesluk and Dr. Steen. Dr. Steen, in turn recommended that plaintiff see a corneal specialist, and Dr. Rohlfing concurred. Dr. Sandham approved the referral, with the result that plaintiff saw Dr. Schwab. Dr. Schwab examined plaintiff, recommended an ERG, lipid testing and cholesterol testing. Dr. Rholfing noted the necessity of the testing and Dr. Sandham approved it. The clinical judgments of Drs. Steen and Rholfing were informed by the opinion of other specialists, i.e., Dr. Tesluk and Dr. Schwab. Plaintiff has not submitted any evidence that the measures that Drs. Rholfing, Steen and Sandham took with respect to the possibility of a corneal transplant were unreasonable. Therefore, no reasonable jury could find in plaintiff's favor. Defendants are entitled to summary judgment on this claim. Necessarily, plaintiff's cross-motion for summary judgment must be denied.

Accordingly, it is hereby RECOMMENDED that:

1. The June 23, 2006, motion for summary judgment filed by defendants Drs. Mangis, Sandham and Rohlfing be granted and that judgment be entered in their favor;

2. The June 21, 2006, motion for summary judgment filed by defendant Dr. Steen be granted and that judgment be entered in his favor;

3. Plaintiff's cross-motion for summary judgment be denied; and

4. The Clerk be directed to close the case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections

15

to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 22, 2007.

/s/ Edmund F. Brennan
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE